UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT PICHEY, et al.,

        Plaintiff,                   FILE NO. 5:05-CV-102

v.                                 HON. ROBERT HOLMES BELL

AMERITECH INTERACTIVE
MEDIA SERVICES, INC., et al.,

        Defendants.

_____/

## OPINION

This is a breach of contract action originally filed in the Circuit Court for Ingham County, Michigan. The action was removed to this Court on July 8, 2005, after the filing of the second-amended complaint. On September 6, 2005, Defendant Ameritech Interactive Media Services, Inc. ("AIMS") and Defendant Ameritech Interactive Media, Inc. ("AIM") both filed motions for summary judgment (docket ##11, 13). For the reasons that follow, Defendants' motions for summary judgment are granted.

### I.

In approximately January 1998, Plaintiffs Robert Pichey and Patricia Pichey began doing business as Victorian Gallery, a specialty furniture retailer. According to Patricia Pichey, while Plaintiffs did a small amount of local business, they intended that most of their sales would be generated through internet advertising and internet contact with their customers and prospective customers. Plaintiffs spoke several times with Shawn

McCracken, an interactive media specialist representing both AIMS and AIM.  On or about February 19, 1998, Patricia Pichey, as owner of Victorian Gallery, entered into certain agreements with AIMS and AIM for the provision of internet advertising services relating to the design, registration and hosting of a custom internet web site.  A total of three agreements were signed, two with AIMS and one with AIM.  One contract with AIMS (AIMS Sales Agreement No. 002451) was for the domain name registration fee, to be provided at a cost of $250, for which Victorian Gallery was to receive $150 credit toward the price of the custom web site development.  The second contract with AIMS (AIMS Sales Agreement No. 007203) was for a fee text advertisement and a standard link.  The contract stated that the cost for the services was included at no extra charge in the cost of the custom site design purchased in Contract No. 000033.  The third contract was with AIM (AIM Sales Agreement No. 000033).  That agreement stated that AIM would provide a custom web site. In the special instructions, the AIM agreement referenced both of the AIMS contract numbers and showed a total charge of $1,350 for the AIM services, which reflected a credit of $150 on the domain name registration agreement with AIMS.

Plaintiffs allege that the promotional materials they received from Ameritech Interactive Media made no distinctions between AIMS and AIM and that they believed they were contracting with a single entity, "Ameritech."  In those promotional materials, the purchase of a custom web site included the following items: (1) virtual hosting; (2) registration on major Internet search engines; (3) a link from the purchaser's business listing

2

in the Ameritech Internet Yellow Pages; (4) a web site symbol in the purchaser's business listing in the Ameritech Internet Yellow Pages; (5) quarterly detailed traffic reports on the number of visitors to the purchaser's site; and (6) full-service web site development.  On another promotional page, "Ameritech" promised that any web site would include the following: (1) a home page; (2) a page detailing products or services; (3) a unique e-mail address and e-mail services; (4) a customer feedback form; (5) virtual hosting; (6) registration on major Internet search engines; (7) a link from the customer's Ameritech Internet Yellow Pages business listing; (8) a web site symbol next to the internet yellow pages listing; and (9) quarterly detailed traffic reports on the number of visitors to the site.

Plaintiffs allege that in late 1999, they were informed by their wholesale supplier that the supplier was concerned about the lack of sales on the part of Victorian Gallery and that the supplier had been unable to locate the Victorian Gallery web page, despite searching on major Internet search engines.  On or about April 20, 2000, Patricia Pichey had a telephone conversation with Monica Watson of AIM.  Watson purportedly admitted that the Victorian Gallery web site had never been registered with the major search engines.  In a memorandum memorializing the conversation, Watson agreed that certain changes would be made to the web site, including the addition of a map, and that five specific site-related key words would be submitted to five major Internet search engines: Lycos, Alta Vista, Excite, Infoseek, and Yahoo.  In addition, on May 3, 2000, Watson confirmed that, pursuant to her conversation with Patricia Pichey, the hosting account for victoriangallery.com would be extended for 18 months, or until November 1, 2001.

Notwithstanding these representations, Plaintiffs contend that neither AIMS nor AIM registered the Victorian Gallery web site with any major Internet search engine.  As a consequence of the failure to register, Plaintiffs allege damages exceeding $3,000,000 in the form of lost opportunity and exposure, out-of-pocket expenses, and lost profits.

## II.

On a motion for summary judgment, a court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court, however, "'need not accept as true legal conclusions or unwarranted factual inferences.'"  *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial.  *Id.*  Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).

4

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his or her claim. *Celotex*, 477 U.S. at 322; *Mulhall v. Ashcroft*, 287 F.3d 543, 550 (6th Cir. 2002). A party opposing a motion for summary judgment "may not merely recite the incantation, 'credibility,' and have a trial in the hope that a jury may believe factually uncontested proof." *Fogery v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "'[D]iscredited testimony is not [normally] considered a sufficient basis'" for defeating the motion. *Anderson*, 477 U.S. at 256-57 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)). In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial. *Celotex*, 477 U.S. at 323-24; *Matsushita*, 475 U.S. at 586-87; *Street*, 886 F.2d at 1480. "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252).

**III.**

In their separate motions for summary judgment, both Defendants argue that Plaintiffs'

claims for damages in the form of lost opportunities, out-of-pocket expenses and lost profits

are barred by the limited liability clause contained in the contracts signed by Plaintiffs.  The

clauses appear, with other provisions, on the reverse of each of the sales agreements:

AMERITECH'S LIABILITY.  The amounts payable by Customer are not sufficient to warrant Ameritech assuming any risk of consequential, incidental or other special damages.  From the nature of the services to be performed, it is impractical and extremely difficult to fix the actual damages which may result from the failure on the part of Ameritech to perform its obligations herein.  **UNLESS THE PARTIES NEGOTIATE A HIGHER LIMIT OF LIABILITY, IF AMERITECH SHOULD BE FOUND LIABLE FOR LOSS OR DAMAGE DUE TO A FAILURE ON THE PART OF AMERITECH REGARDLESS WHETHER THE CUSTOMER'S CLAIM IS BASED ON CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, THE LIABILITY SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE CONTRACT PRICE OR [SIC] THE DISPUTED SERVICES, OR THAT SUM OF MONEY ACTUALLY PAID BY CUSTOMER TOWARD THE DISPUTED SERVICES, WHICHEVER SUM SHALL BE LESS, AS LIQUIDATED DAMAGES AND NOT AS A PENALTY, AND THIS LIABILITY SHALL BE EXCLUSIVE. IN NO EVENT SHALL AMERITECH BE LIABLE FOR ANY LOSS OF CUSTOMER'S BUSINESS, REVENUES, PROFITS, THE COST TO CUSTOMER OF THEIR ADVERTISEMENT OR ANY OTHER SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY NATURE, OR FOR ANY CLAIM AGAINST CUSTOMER BY ANY THIRD PARTY. ALL EXPRESS AND IMPLIED WARRANTIES REGARDING THE WEB SITE AND INTERNET SERVICES ARE DISCLAIMED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**  Ameritech shall not be liable for delays or interruption in production and/or presentation in the event of acts of God, by any government or quasi-governmental entity, fire, flood, insurrection, riot, explosion, embargo, strikes, labor or material shortage, transportation interruption of any kind, temporary interruption in internet services due to necessary repair or

6

adjustments, or any condition beyond the direct control of Ameritech. Customer acknowledges that Ameritech cannot guarantee any results of any sort whatsoever as a result of the web site or Internet Services.

(Ex. 1 to Compl. (emphasis and capitalization in original).)  In addition, Defendant AIMS contends that no genuine issue of fact exists that AIMS' contract with Plaintiffs included an agreement to register Plaintiffs' web site.  Because the Court finds that the limited liability clause is enforceable, the Court need not address AIMS' remaining argument.

Under Michigan law, "unambiguous contracts are not open to judicial construction and must be *enforced as written*."  *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) (emphasis in original).  A court "has no authority to change the terms of a contract simply because it might feel that it was an unwise contract for a party to have entered into. *See Mich. Assoc. of Psychotherapy Clinics v. Blue Cross*, 301 N.W.2d 33, 40 (Mich. App. 1980).  The courts expressly have recognized that a limitation of liability clause that limits damages in case of breach is enforceable if the nature of the transaction makes damages difficult to ascertain.  *See Ross v. Loescher*, 116 N.W. 193 (Mich. 1908); *St. Paul Fire and Marine Ins. Co. v. Guardian Alarm Co.*, 320 N.W.2d 244 (Mich. App. 1982).  Where a contract provision is unambiguous, "[o]nly recognized traditional contract defenses may be used to avoid the enforcement of the contraction provision." *Rory*, 703 N.W.2d at 31.  Such defenses include duress, waiver, estoppel, fraud and unconscionability.  *Id.* at 31 n.23.

Plaintiffs do not dispute that all three contracts they signed contained an identical limited liability clause, which, if enforceable, would bar the specific forms of damages they

7

presently seek.  They contend, however, that the clauses are not enforceable because they are unconscionable.  They also contend that the clauses are not enforceable because they fail of their essential purpose by depriving Plaintiffs of the substantial benefit of their bargain.

A.    Unconscionability

Under Michigan law, in order to invalidate a contract provision for unconscionability, a party must demonstrate that the provision is both procedurally and substantively unconscionable.  *See Allen v. Mich. Bell. Tel. Co.*, 171 N.W.2d 689, 692 (Mich. Ct. App. 1969); *Northwest Acceptance Corp. v. Almont Gravel, Inc.*, 412 N.W.2d 719, 723 (Mich. Ct. App. 1987).  Before finding a provision to be unconscionable, a court must make two inquiries:

> (1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?;
> (2) Is the challenged term substantively reasonable?

*Allen*, 171 N.W.2d at 692.  In other words, in order to show unconscionability, a party must demonstrate "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  *Northwest Acceptance*, 412 N.W.2d at 723.  Although unconscionability is rarely found in a commercial context, *see U.S. Fibres v. Proctor & Schwartz, Inc.*, 509 F.2d 1043, 1048 (6th Cir. 1975), in limited circumstances, the courts have found commercial contracts to be unconscionable, *see Northwest Acceptance Corp.*, 412 N.W.2d at 722; *Allen*, 171 N.W.2d at 694; *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264 (E.D. Mich. 1976).

###### 1.      Procedural unconscionability

A contract is procedurally unconscionable if a party, in agreeing to the contract, has no realistic alternative to agreement. *See Allen*, 171 N.W.2d at 694.  Courts have refused to enforce agreements "where one party is at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence." *Id.* at 693 (internal citations omitted).  However, "merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of contract will not be enforced against him; if the term is substantively reasonable it will be enforced." *Id.* at 692.

The Michigan Court of Appeals previously addressed a situation in which a limited liability clause was included in a contract for yellow pages advertising with a defendant telephone company. *See Allen*, 171 N.W.2d 689.  In *Allen*, an insurance agent contracted to place several advertisements in the Flint classified telephone directory.  The clause in issue limited liability for breach of contract to the amount paid for such advertising in the issue in which the error occurred.  The defendant telephone company subsequently failed to include the advertisement in the yellow pages as it had promised in the contract.  *Id.* at 690.  The plaintiff claimed that the telephone company, as a public utility, could not limit liability for its own negligence. *Id.* at 691-92.  The court concluded, however, that, in the circumstances of the case, the telephone company was the only free yellow pages provider and had an effective monopoly on the services.  *Id.* at 693-94.  The court also recognized that no

different but comparably inexpensive advertising vehicle was available to the plaintiff. *Id.* The court therefore found procedural unconscionability because the plaintiff had no practical alternative but to sign the agreement. *Id.* The court went on to find that, because the clause limited damages to the contract price in circumstances where the contract was wholly unperformed, the clause effectively relieved the company of all liability and therefore was substantively unreasonable. *Id.* at 694.

Since it was issued, the Michigan courts have limited the scope of *Allen*. In *St. Paul Fire*, 320 N.W.2d 244, the court considered a case in which a company contracted with a provider of a burglar alarm system. The contract included a limited liability clause that fixed damages for breach at the aggregate amount of six monthly payments or $250, whichever was less. When plaintiff company was burglarized, its insurer sought damages from the burglar alarm company. The *St. Paul Fire* court held that, in contrast to *Allen*, the plaintiff company was not effectively forced to use a monopolistic burglar alarm supplier. In addition, damages caused by failure of the system would have been difficult to ascertain, given the variability of inventories. Further, even if such damages theoretically were ascertainable through inventory monitoring, the court emphasized that the burglar system provider was not an insurer. *Id.* at 247. On the basis of all of these factors, the court found that the transaction was not procedurally unconscionable, notwithstanding differences in bargaining power. *Id.*

Similarly, in *Mich. Ass'n of Psychotherapy Clinics*, 301 N.W.2d at 40, the court again distinguished *Allen*, concluding that the reasoning of *Allen* stood for a limited proposition:

> [W]here goods or services used by a significant segment of the public can be obtained from only one source, or from limited sources on no more favorable terms, an unreasonable term in a contract for such goods or services will not be enforced as a matter of public policy.

*Allen*, 171 N.W.2d at 694, *quoted in Mich. Ass'n of Psychotherapy Clinics*, 301 N.W.2d at 40. The court in *Mich. Ass'n of Psychotherapy Clinics* noted that, while Blue Cross was a major health insurer, it was not the only health insurer. *Id.* at 41. The plaintiff, therefore, was not faced with a single monopolistic option faced by the plaintiff in *Allen*. *See also Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471 (Mich. Ct. App. 2005) (holding that a limitation on the statute of limitations for all employee claims was not procedurally unconscionable, notwithstanding the fact that the clause was included in an employee application completed four months before the employee was hired); *USAA Group v. Universal Alarms, Inc.*, 405 N.W.2d 146, 147 (Mich. Ct. App. 1987) (rejecting claim that individuals who contracted with alarm company were in a procedurally unconscionable bargaining position, since other alarm systems, even if different in type, were available to the plaintiffs); *WXON-TV v. A.C. Nielsen Co.*, 740 F. Supp. 1261 (E.D. Mich. 1990) (holding that a contract between a television station and a rating service was not procedurally unconscionable because the company was not a monopolistic public service, despite the fact that the rating service was one of only two such services, both of whom limited damages).

Plaintiffs argue that the case is more closely analogous to *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264 (E.D. Mich. 1976). In *Johnson*, plaintiff service station owner sued Mobil Oil Corporation for providing adulterated gasoline that allegedly caused a fire which destroyed the plaintiff's service station. Johnson's contract with Mobil excluded "special, indirect or consequential damages, and Mobil attempted to limit damages to "difference money damages," the difference between the value of the goods at the time and place they were accepted and the value they would have had if they had been warranted. The court found the limited liability clause to be unconscionable, in part because the station owner had completed only one-and-one-half years of high school and had limited business experience. Plaintiffs argue that they were similarly uneducated. In contrast to Johnson, however, both plaintiffs had graduated from high school and Patricia Pichey attended two years of college. Both have run another business for a number of years. Plaintiffs were not in the same position as Johnson.

Plaintiffs next suggest that the contract provision was procedurally unconscionable because they were presented with a standardized and preprinted contract containing the limited liability clause on the reverse side of the document. However, the courts routinely have rejected a finding of procedural unconscionability on the grounds that a plaintiff was presented with a preprinted, form contract rather than engaging in a clause-by-clause negotiation of an agreement. *See Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 42 (Mich. 2005) ("The term 'adhesion contract' may . . . be used to describe a contract for goods or

services offered on a take-it-or-leave-it basis.  But it may not be used as a justification for creating any adverse presumptions or for failing to enforce a contract as written."); *St. Paul Fire*, 320 N.W.2d at 247 ("The mere fact that a contract is standardized and preprinted does not make it unenforceable as a contract of adhesion.").

Moreover, in two unpublished decisions, courts have considered whether contracts with Ameritech Publishing, Inc., another sister corporation to AIM and AIMS, were unconscionable because they contained preprinted and nearly identical limited liability clauses to those present in the instant case.  *See All Makes S-V, Inc. v. Ameritech Pub., Inc.*, No. 221188, 2001 WL 951381 (Mich. Ct. App. Aug. 21, 2001); *Nolan, Inc. v. Ameritech Pub., Inc.*, No. 89-CV-72028 (E.D. Mich. April 3, 1990).  In both decisions, the courts considered whether Ameritech's failure accurately to publish information in its yellow pages could be subjected to a limited liability clause.  The courts concluded that *Allen* was inapplicable to the case because, at the time of those decisions, Ameritech no longer was a monopolistic public utility or the sole provider of free yellow pages.  Instead, because telephone services had been deregulated, the plaintiff had other yellow page opportunities available, as well as radio, television and print advertising.  Accordingly, both courts found that the limited liability clauses in issue were not procedurally unconscionable.  *All Makes S-V*, 2001 WL 951381, at *1-2; *Nolan*, No. 89-CV-72028, slip op. at 3-4.

In the instant case, it is undisputed that the internet hosting and web design services purchased by Plaintiffs from AIM and AIMS were available from many sources.

13

Specifically, Defendant AIMS has provided copies of local telephone directories for the period between 1997 and 2001, all of which demonstrate the availability of multiple internet service providers and web design companies providing a wide range of services.  (AIMS Reply Br., Ex. 14.) They also have attached the affidavit of Beth Kinna, which declares on personal knowledge that multiple alternate sources were available at the time of the contract. (Kinna Aff., ¶6.; AIMS Brief for Sum. J., Ex. 6.)  Plaintiffs' argue, however, that AIMS and AIM, operating collectively, provided the only available opportunity for Plaintiffs' to purchase all of the desired services from the same source and a source that also published a paper yellow pages.  Plaintiffs' distinction is unreasonable.  All of the services Plaintiffs desired could have been provided by numerous sources.[1]  Absolutely no facts have been alleged or proved that would demonstrate an essential reason for having the electronic

---

[1]Plaintiffs present the affidavit of a law clerk (G. Alan Wallace), which contains hearsay evidence provided by an employee of Verizon Communications (Ed Fritz), who formerly was employed with GTE Corporation before its merger with Bell Atlantic to form Verizon in 2000.  Fritz purportedly told Wallace that, from 1998 to late 2000, GTE Super Pages had only one on-line yellow page competitor in Michigan: Ameritech.  Further, Fritz purportedly advised that GTE did not offer its web page design and registration services until late 2000, and did not offer a link from its yellow pages until 2000.  (G. Alan Wallace Aff., ¶¶ 3-9.)  On a motion for summary judgment, the party opposing the motion has the burden of introducing evidence sufficient to withstand the motion. FED. R. CIV. P. 56(a).  Rule 56(e) requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies of all documents referred to in the affidavit.  *Id.* Hearsay evidence cannot be considered on a motion for summary judgment. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003); *Wiley v. U.S.*, 20 F.3d 222, 225-26 (6th Cir. 1990); *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969).

services provided by the same company as the paper services.  Moreover, even were such a basis demonstrated, the distinction would not show that Plaintiffs lacked reasonable alternatives.  The mere fact that a party may prefer the particular and specific features of a service provided by one company does not render that company's service monopolistic or the realistic alternative available.  *See, e.g., USAA Group*, 405 N.W.2d at 147 ("We are not aware of any limitations preventing the Muellers from obtaining a central monitoring arrangement from another source *or from obtaining some other protection system, such as a noise-generating system or a sprinkler system*.") (emphasis added).  The case, therefore, is completely distinguishable from the circumstances presented in *Allen*, 171 N.W.2d at 692-93, in which there was no realistic alternative to yellow pages advertising through Michigan Bell.

Further, the Court rejects Plaintiffs' argument that they have shown that all competitors included the same limited liability language.  In support of their argument, Plaintiffs rely on the deposition testimony of AIM employee, Beth Kinna.  Contrary to Plaintiffs' representations, however, Kinna did not testify that all other competitors had similar clauses.  She, in fact, denied having seen competitors' clauses, having been told about their contents, or having known whether competitors' contracts differed from those of AIM and AIMS.  When asked to speculate, she began to answer with an equivocal word, but was interrupted by an objection.  (Kinna dep. at 71; Pl. Br. in Opp. to AIM Mot., Ex. L.)  Even

had she answered, such speculation would not have constituted admissible evidence about the contents of competitor agreements.

Plaintiffs next argue that, because they did not read the contract, they should be excused from application of the limited liability provision.  While Plaintiffs do not specifically claim that they were completely unaware of the numerous preprinted clauses on the backs of the agreements they signed, they aver that the existence of the limited liability clause was never pointed out to them by Defendants' representative.  Under Michigan law, "one who signs an agreement, in the absence of coercion, mistake, or fraud, is presumed to know the nature of the document and to understand its contents, even if he or she has not read the agreement." *Clark*, 706 N.W.2d at 475.  Plaintiffs may not claim to be excused from those portions of the contract they sign simply because they neglected to read them. Moreover, the effect of one party's failure to read a provision may do nothing more than prevent a contract from forming; it does not permit enforcement of alternate terms against the other party:

> [T]he expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable.  If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.  But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just.

*Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 788 (Mich. 2003) (quoting *Raska v. Farm Bureau Mut. Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982)); *see also Rory*, 703 N.W.2d at 42

(same).  Plaintiffs' argument, therefore, cannot support its claim for damages beyond those provided in the limited liability clause.

In sum, the evidence unequivocally shows that AIM and AIMS were not the sole providers for the range of services purchased by Plaintiffs.  In addition, the types of services available through AIM and AIMS did not offer the only "realistic alternative" for Plaintiffs to advertise their products.  *Allen*, 171 N.W.2d at 694.  Because Plaintiffs have failed to show that Defendants had the sort of monopolistic power described in *Allen*, the case is controlled by the reasoning of *St. Paul Fire*, 320 N.W.2d at 246-47.  As a result, Plaintiffs fail to demonstrate the necessary procedural unconscionability.[2]

## 2.    Substantive unconscionability

Even had Plaintiffs demonstrated procedural unconscionability, their claims would fail because they have failed to show substantive unconscionability.  "Whether a contractual provision is substantively unreasonable or unconscionable depends on the commercial

---

[2]In support of their claim of both procedural and substantive unconscionability, Plaintiffs also rely heavily on *Jacada, Ltd. v. Int'l Mktg. Strategies, Inc.*, Nos. 1:02-CV-479, 1:02-CV-78 (W.D. Mich. Oct. 21, 2003), *aff'd* 401 F.3d 701 (6th Cir. 2005).  In *Jacada*, this Court upheld an arbitration award in which the arbitrator found a limited liability provision to be unconscionable under Michigan law.  The Court noted that its review was limited to determining whether the arbitrator's decision was in "manifest disregard of the law."  *Id.*, slip op. at 6 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).  The Court acknowledged that mere error in interpretation or application of the law was insufficient.  Applying that standard, the Court concluded that, while it might disagree with the arbitrator's finding of unconscionability, it could not say that the finding was entered in manifest disregard of the law.  *Id.*, slip op. at 12.  In light of the highly deferential standard of review involved in *Jacada*, the case is of limited applicability to the question before the Court requiring *de novo* application of Michigan law.

17

setting, purpose and effect of the provision." *Mich. Ass'n of Psychotherapy Clinics*, 301 N.W.2d at 41 (citing *Reed v. Kaydon Eng'g Corp.*, 196 N.W.2d 487 (Mich. Ct. App. 1972)). "Reasonableness is the primary consideration." *St. Paul Fire*, 320 N.W.2d at 247.  However, a contract is not substantively unconscionable simply because it is foolish for one party and very advantageous to the other." *Clark*, 706 N.W.2d at 475.  Instead, a provision is substantively unreasonable "where the inequity of the term is so extreme as to shock the conscience." *Id.*

Plaintiffs have not and cannot demonstrate such conscience-shocking inequity.  The limited liability provision in the instant case permits Plaintiffs to recover the full amount of their contract price of $1,600.  That liquidated damage amount for the type of breach alleged in this case is not shocking to the conscience.  In addition, Plaintiffs already have received a substantial extension of the term of their agreement on the grounds of the alleged breach. Further, Plaintiffs do not dispute that Defendants completed all of the promises of the contract, with the exception of the promise to register the web site with the major internet search engines.  Indeed, Plaintiffs acknowledge that, in addition to being able to contract with other providers, Plaintiffs themselves could have registered their web site with the internet search engines.  Moreover, Plaintiffs have introduced no evidence to contradict Beth Kinna's testimony that, even in 1998, if a web site were registered with a search engine, there was no guarantee that the search engine would post it.  (Kinna dep., at 56.; Pl. Brief Opp. AIM Mot. for Sum. J., Ex. L.)

Here, as in *St. Paul Fire*, Defendants are "not in the insurance business." 320 N.W.2d at 247. The contracts made it clear that Defendants did not promise particular results from the web-based advertising they agreed to provide. "Under these circumstances a clause limiting defendant's liability in the event the [web site] did not work properly is not unconscionable." *Id.* (finding limitation of the aggregate of six monthly payments or $250 was manifestly reasonable); *see also USAA Group*, 405 N.W.2d at 147 (limitation of $250 not substantively unreasonable); *WXON-TV*, 740 F. Supp. at 1266 (limitation of six months' payments or $250 not unreasonable). Under the clearly established case law, the limited liability clause in the instant case was not substantively unconscionable.

B.    Failure of Contract's Essential Purpose

Plaintiffs next argue that the limited liability clause is unenforceable because it fails of its essential purpose. They argue that the clause deprives Plaintiffs of the benefit of their bargain, permitting Defendants to escape liability for a breach of their agreement.

Under Michigan law, the failure-of-the-essential-purpose doctrine applies only to matters falling under Article 2 of the Uniform Commercial Code ("UCC"), MICH. COMP. LAWS § 440.2102. Article 2 of the UCC, however, applies only to transactions in goods, not transactions for services. *See Wells v. 10-X Mfg. Co.*, 609 F.2d 248, 254 (6th Cir. 1979); *DeValerio v. Vic Tanny Int'l*, 363 N.W.2d 447 (Mich. Ct. App. 1984); *Plymouth Pointe Condo. Ass'n v. Delcor Homes-Plymouth Pointe, Ltd.*, No. 233847, 2003 WL 22439654, at

19

*2 (Mich. Ct. App. Oct. 28, 2003).  No Michigan case has applied the doctrine to a services

contract.

Plaintiffs rely exclusively on this Court's decision in *Jacada*, Nos. 1:02-CV-479 and

1:02-CV-78.  In *Jacada*, the Court acknowledged that the failure-of-the-essential-purpose

doctrine was, by its terms, applicable only to Article 2 agreements.  *Jacada*, slip. op. at

13-14.  The Court, however, concluded that at least two federal courts had applied the

doctrine to a service contract or a hybrid contract involving both service and sale of goods.

As a result, while the Court expressed skepticism about the correctness of the arbitrator's

application of the doctrine to a services agreement, it could not conclude that such

application actually "fl[ew] in the face of clearly established legal precedent." *Id.* (quoting

*Merrill Lynch*, 70 F.3d at 421).

In the instant case, however, the Court must apply the law *de novo*.  The Court finds

no basis in the Michigan case law for extending the doctrine to cases outside the application

of Article 2.  Instead, the doctrine of unconscionability more properly provides the vehicle

for determining whether the terms of a services contract are sufficiently one-sided as to

undermine the purpose of the agreement.

Moreover, even were the Court to apply the doctrine to a service agreement, the

instant limited liability clause does not fail of its essential purpose.  Instead, under the limited

remedy provided in the contract, Plaintiffs may recover a full refund for an alleged failure

to complete a small portion of the agreement that Plaintiffs themselves were fully capable

of rectifying with little effort.  *See WXON-TV*, 740 F. Supp. at 1266-67 (considering whether a limitation of remedies clause failed of its essential purpose when it permitted a party to recover a refund or receive a credit in the amount paid).  While Plaintiffs attempt to characterize the alleged breach as a complete failure to perform, they do not dispute that they received a registered domain name, web site and page design, e-mail addresses, a link from their internet yellow page listing to the web site, and virtual hosting.  Registration with search engines, even if completed, would not have guaranteed inclusion by search companies in search results, and the failure to register did not render the web site and e-mail contacts useless.  As a result, the damages permitted under the contract clearly are sufficient to create a binding, mutual contract and prevent Defendants from escaping all liability for their alleged negligence.  *Id.*

## IV.

For the foregoing reasons, the Court will grant Defendants' motions for summary judgment.  A judgment consistent with this opinion shall be entered.

Date:   February 8, 2006          /s/ Robert Holmes Bell
                                  ROBERT HOLMES BELL
                                  CHIEF UNITED STATES DISTRICT JUDGE